Filed 9/25/20  P. v. Angel G. CA4/2
First mod. order and unmodified opinion attached

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGEL G.,<br><br>    Defendant and Appellant. | E071386<br><br>(Super.Ct.No. RIF1501079)<br><br>**SECOND ORDER MODIFYING OPINION**<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT

The opinion filed in this matter on June 15, 2020, and modified on July 1, 2020, is further modified as follows:

On page 31, first full paragraph, fifth line, replace the word "murder" with "voluntary manslaughter";

On page 35, third line, replace the word "murder" with "voluntary manslaughter"

1

Except for these modifications, the opinion remains unchanged.  The

modifications do not effect a change in the judgment.


FIELDS                        
                                        J.

We concur:


CODRINGTON                
                Acting P. J.


RAPHAEL                    
                    J.

Filed 7/1/20  P. v. Angel G. CA4/2 (first mod. order)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071386 |
| v. | (Super.Ct.No. RIF1501079) |
| ANGEL G., | ORDER MODIFYING OPINION; AND DENIAL OF PETITION |
| Defendant and Appellant. | FOR REHEARING |
| | [NO CHANGE IN JUDGMENT] |

Appellant's petition for rehearing filed June 29, 2020, is denied.  The opinion filed in this matter on June 15, 2020, is modified as follows:

On page 27, second full paragraph, third to last line, replace the phrase "4Dub members" with "members of Corona's group";

On page 34, third line, replace the word "murder" with "voluntary manslaughter"

1

Except for these modification, the opinion remains unchanged.  The modifications do not effect a change in the judgment.

FIELDS\
_____
                                                                        J.

We concur:

CODRINGTON\
_____
                Acting P. J.

RAPHAEL\
_____
                        J.

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

  Plaintiff and Respondent,

v.

ANGEL G.,

  Defendant and Appellant.

E071386

(Super.Ct.No. RIF1501079)

OPINION

APPEAL from the Superior Court of Riverside County.  John D.  Molloy, Judge. Affirmed in part and reversed in part with juvenile court directions.

Donna L.  Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L.  Garland, Assistant Attorney General, A.  Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

Defendant and appellant, Angel G., was 15 years old when he shot and killed 19-year-old Jose Corona on April 30, 2015. Defendant was tried as an adult in criminal court. In May 2018, a jury found him guilty of voluntary manslaughter in count 1 (Pen. Code, § 190, subd. (a)[1]), as a lesser offense to the charge of murder, and guilty as charged of unlawfully possessing a firearm in count 2. (§ 29820.) The jury also found that defendant personally used a firearm in count 1 (§ 12022.5, subd. (a)) but found a gang allegation in count 1 not true. (§186.22, subd. (b).)

On September 21, 2018, defendant was sentenced to 16 years in state prison: six years (the upper term) on count 1 plus 10 years for the personal use enhancement. A two-year term (the middle term) was stayed on count 2. The court also imposed various fines and fees.

At trial, defendant claimed he shot and killed Corona in self-defense or in defense of others, and the jury was instructed on the right of self-defense and defense of others pursuant to CALCRIM No. 505. In this appeal, defendant claims and we agree that the trial court prejudicially erred in instructing the jury on the "mutual combat" and "initial aggressor" exceptions to the right of self-defense, pursuant to CALCRIM No. 3471.

As we explain, CALCRIM No. 3471 was erroneously given because insufficient evidence showed that there was any mutual agreement or mutual intention to engage in mutual combat, or that defendant and his cohorts were the initial aggressors in any

---

[1] Undesignated statutory references are to the Penal Code.

confrontation, before defendant shot and killed Corona and his right to claim that the killing was justified in self-defense or in defense of others arose. The instructional error was prejudicial because there is a reasonable probability that the jury would have agreed that defendant shot and killed Corona in self-defense or in defense of others, had CALCRIM No. 3471 not been given. Thus, we reverse defendant's voluntary manslaughter conviction in count 1 and the personal use enhancement on that conviction.

Defendant also raises three claims of sentencing error, which the People and we agree have merit: (1) the order requiring defendant to pay $1,500 for the costs of his presentence incarceration was unauthorized (§ 1203.1c) and must be stricken from the judgment; (2) the language in the sentencing minute order prohibiting defendant from owning, possessing, or controlling any "deadly weapons" or "related paraphernalia" was unauthorized (§ 29810) and must also be stricken from the judgment; and (3) on remand, defendant must be allowed an opportunity to show that he is unable to pay a total of $954.53 in fines and fees, which were imposed at sentencing without a determination of his ability to pay them. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157.)

On September 30, 2018, while this appeal was pending, the Governor signed Senate Bill 1391, which, effective January 1, 2019, amended the Welfare and Institutions Code to prohibit juveniles from being tried in adult court for specified crimes, including the crimes charged here, if the juvenile was under the age of 16 when he or she

committed the crimes.[2]  In this appeal, defendant claims and the People and we agree that Senate Bill 1391 applies retroactively to judgments, which were not final on appeal when the legislation became effective on January 1, 2019—including defendant's judgment.

Accordingly, we reverse defendant's sentence and remand the matter to the juvenile court with directions to treat defendant's convictions as juvenile court adjudications, to impose an appropriate juvenile court disposition, and to conduct further proceedings, as appropriate and consistent with this opinion.

## II.  FACTS AND PROCEDURAL HISTORY

A. *Prosecution Evidence*

1. Gang and Background Evidence

A gang expert testified that, at the time of the April 2015 shooting, 4Dub was a criminal street gang, which began around 2011 as a "party slash tagging crew."  4Dub had around 20 members, and defendant was an active 4Dub member in 2015.  4Dub did not get along with two other criminal street gangs, Wicked Minded Soldiers (WMS) and War Wood (WW), even though some members of the three gangs had grown up together and had been friends.  4Dub disrespected WMS and WW by crossing out WMS and WW graffiti with 4Dub graffiti.

4Dub member Jorje R. was a principal prosecution witness to the April 30, 2015 shooting, the circumstances surrounding the shooting, and historical and antecedent facts

---

[2]  An exception applies if the juvenile was not apprehended until after juvenile court jurisdiction ended.  But this exception does not apply here, because defendant was arrested shortly after the April 30, 2015 shooting, when he was still 15 years old.

4

concerning 4Dub, WMS, and WW.[3]  Jorje R. was in his early 20's at the time of the April 2015 shooting and was one of 4Dub's older members.  According to Jorje R., 4Dub was not a criminal street gang; it was a tagging crew whose members liked to hang out and smoke marijuana.  4Dub formerly called itself "4/20," a date associated with marijuana.  The "bad blood" between 4Dub, on one side, and WMS and WW on the other, began before the shooting when 4Dub and WW got into a fight at a party.  A White WW member, Anthony H., "started being racist against [B]lacks;" a "[B]lack guy" beat up Anthony H. and a guy named "Chuckie;" and 4Dub members were trying to help the Black guy in the fight.[4]  This offended Anthony H., who used a racial slur toward all the 4Dub members.  4Dub had Black, White, and Hispanic members, and Anthony H.'s racism offended 4Dub.  In another incident that occurred before the April 2015 shooting, an unknown WW member killed a close friend of the 4Dub crew, Christian Cano.  Following the unsolved Cano homicide, WMS and WW members posted things on social media, taunting 4Dub members about Cano's murder and angering 4Dub members.  4Dub members disliked Jose Corona, the man whom defendant shot and killed on April 30, 2015, because Corona had disrespected Cano.

---

[3]  In their briefs, both parties cite extensively to the 112-page transcript of Jorje R.'s May 1, 2015 police interview.  But no part of the interview was admitted in evidence.  Our summary of the prosecution's evidence is based on Jorje R.'s May 2018 trial testimony and the other evidence admitted at trial.

[4]  The record does not indicate who the "[B]lack guy" was, whether the Black guy was a 4Dub member, or whether "Chuckie" was a WW or WMS member.

For some time before the shooting, WMS and WW members often fought with 4Dub members at parties. WMS and WW members hated 4Dub and would "go after" 4Dub members to fight them. But according to Jorje R., 4Dub members did not pick fights with anyone and tried to avoid fights with WMS and WW.

Most but not all of the time, 4Dub members would run away from WMS and WW because they feared WMS and WW and did not want to fight with them. WMS and WW members did not fight fair: they often had weapons, outnumbered 4Dub members, had tried to run over 4Dub members with their cars, and were generally larger in size than the 4Dub members. But 4Dub members were "sometimes" "more than willing to get into fights" with WMS and WW.

2. The April 30, 2015 Shooting

During the early evening of April 30, 2015, Jorje R. was hanging out with six or seven other 4Dub members in the front yard of Mikey L.'s house on Remington Street, on the corner of Remington and Challen Streets in Riverside. The other 4Dub members present included defendant, Mikey L., Jorje R.'s brother, Moyses R., Lorenzo F., Michael F., and Gary W. Mikey L.'s three- or four-year old brother was also at the house. Mikey L. had a gun and was "showing it around." According to Jorje R., this was the gun that defendant later used to shoot and kill Corona. On the day of the shooting, defendant was 15 years old, was five feet three inches tall, weighed 100 to 110 pounds, and "looked like he was maybe 12 years old."

The front yard of Mikey L.'s house was surrounded by a chain-link fence. The 4Dub members were relaxing and drinking beer in the front yard behind the fence. When

6

it was still light outside, Corona, a WMS member, drove down Challen Street in his black "classic car" and stopped at the stop sign at the corner of Challen and Remington Streets, near Mickey L.'s house. Corona and the 4Dub members who were hanging out in Mickey L.'s front yard began yelling obscenities at each other. Corona yelled "Fuck Four Dubs" and later said, "[D]on't trip. I'll be back," then drove away. This initial verbal confrontation lasted around two minutes.

Around 20 minutes later, a red Acura drove up and parked on Challen Street, across the street from the side yard to Mikey L.'s house. There were at least two people in the Acura, but they never got out of the car. Mikey L. walked outside of his fenced yard and began to approach the Acura's occupants to confront them. No one went with Mikey L., and Mikey L. did not have the gun that he had been showing around earlier.

Mikey L. never got to the Acura. Just as Mikey L. stepped into the street on his way to confront the Acura's occupants, Jorje R. saw WMS member Corona and WW member Anthony H. walking down Challen Street, followed by a group of 10 to 15 people (Corona's group).[5] Other than Corona and Anthony H., Jorje R. did not recognize anyone in Corona's group, but he saw that "some" of the members of Corona's group were wearing black gloves and were covering their faces with bananas. This concerned Jorje R. because the men who killed Christian Cano were similarly masked and gloved. But Jorje J. did not see that anyone in Corona's group had guns, baseball bats, or other weapons of any kind.

---

[5] Corona weighed around 275 to 280 pounds at the time of the shooting. Anthony H. weighed 180 to 200 pounds and was six feet tall.

As Corona's group approached, Michael F. and Moyses R. were standing on the sidewalk in front of Mikey L.'s house, while the rest of the 4Dub members, including Jorje R. and defendant, were inside the fenced yard. The 4Dub members and Corona's group began yelling things at each other; among other things, someone from Corona's group yelled "Fuck Christian Cano," and someone yelled, "Fuck WarWood." Jorje R. then heard a gunshot. He looked in defendant's direction and saw defendant lowering the gun with both of his hands. Defendant's eyes were "wide open" and he had a surprised look on his face.

After the shot was fired, the 4Dub members and Corona's group immediately left the scene. Jorje R. saw defendant leave in a Mustang with other 4Dub members. Corona fell to the ground as Corona's group was running away. Corona's friends put him into a car and took him to the hospital. Around 9:30 p.m., Corona died from a single gunshot wound to his abdomen, which transected his iliac artery.

The gun defendant used to shoot and kill Corona was never found. Investigating officers found an expended .40-caliber casing in the front yard of Mikey L.'s house. In one of the bedrooms, they found a live .40-caliber round, and in the garage they found 13 live .40-caliber rounds in an ammunition box. Another live .40-caliber round was found in the grass outside the pedestrian door to the garage. No other shell casings and no bullet strikes were found in, on, or near Mikey L.'s house. In the street in front of the house, officers found the broken handle of a wooden baseball bat.

### 3. Mark T.'s Testimony

WMS member, Mark T., was a good friends with Corona and Anthony H. and was with them (in Corona's group) at the time of the shooting. Mark T. was unavailable to testify at trial but his testimony from defendant's preliminary hearing was read into evidence. Mark T.'s testimony showed that, on April 30, 2015, Corona arrived at Mark T.'s house in Corona's black "muscle car" and told Mark T. about a confrontation he had just had with some people at the house on Remington Street, Mikey L.'s house. Mark T.'s house was only a five- to seven-minute walk from Mikey L.'s house.

After Corona arrived, Mark T., Corona, Antony H., and three other men who were already at Mark T.'s house went for a walk down Challen Street, intending, Mark T. said, to visit a house on Noble Street to smoke marijuana, but on their way to that house they walked past Mikey L.'s house. Mark T. saw around seven people at Mikey L.'s house, approximately the same number in Corona's group. Mark T. denied that he or anyone else in Corona's group intended to fight with anyone at Mikey L's house. Mark T. also denied that anyone in Corona's group was wearing masks or gloves or had any guns, baseball bats, or other weapons. Mark T. admitted there had been "confrontations" between 4Dub, on one side, and WMS and WW, on the other, and that "most of the time" 4Dub "would run away" from the fights.

As Corona's group walked by Mikey L's house, they stayed on the sidewalk on the opposite side of the street. Mark T. heard someone from the house say, "That's them," and in response, someone from Corona's group said, "Fuck you guys." The groups then began yelling at each other. Mark T. heard people from Mikey L.'s house

9

yelling "4Dub." By this time, Mark T. thought there was going to be a fight. He took two or three steps into the street, and said, "Who's first?" meaning to ask who from the 4Dub group wanted to fight first.[6] At that point, a shot was fired.

Mark T. did not see who fired the shot or where it came from. Before the shot was fired, no physical fight had begun, and no one from Corona's group, except Mark T., had stepped off of the sidewalk across the street from Mikey L.'s house. When the shot was fired, Corona was standing three feet behind Mart T., to Mark T.'s right. Three people from the 4Dub group were standing on the sidewalk in front of Mikey L's house, and three or four additional 4Dub members were in the yard behind the fence. Mark T. did not see anyone from the 4Dub group carrying "a stick or pole." After the shot was fired, all of the members of Corona's group began running back toward Mark T.'s house. Corona complained of pain in his stomach area and fell to the ground. He was put into a car and taken to the hospital.

4. Additional Prosecution Evidence

Around 8:00 p.m., a neighbor who lived across the street from Mikey L.'s house on Remington Street heard two groups "arguing." He looked outside and saw that each group was made up of 7 to 8 people. He then heard "a shot" and saw a man fall to the ground. He thought he heard two shots, but he was not certain. He did not see that anyone in either group had any guns or other weapons. It was not dark outside when the shooting occurred; it was "[m]ore like about sunset."

---

[6] Mark T. weighed 250 pounds and was six feet two inches tall.

10

Another witness, Denard A., testified that he was driving down Challen Street in his black Acura, with a passenger, when he heard a gunshot. Denard A. was friends with Corona, Anthony H., and Mark T., but he denied he was "part of any potential fight." He stopped his car when he heard a friend "whistle" which meant that a friend was in danger. He turned his car around, put Corona into his car, and took Corona to the hospital.

5. Defendant's Prior Offenses

Defendant was arrested five times between April 2014 and January 2015 when he was 14 years old. He turned age 15 in February 2015. In April 2014, defendant and Ezequiel C. were arrested for trying to steal bicycles from an intermediate school by using bolt cutters to cut the bicycle locks. In June 2014, defendant and Moyses R. were arrested for possessing a stolen vehicle, and defendant had a juvenile adjudication for the offense.

In July 2014, defendant was arrested for attempted commercial burglary. A video surveillance camera recorded defendant, Lorenzo F., and Alfonso R. trying to kick in the door to a commercial establishment, and defendant flashing 4Dub gang signs. In August 2014, defendant, Jorje R., and D.D. were arrested for attempted robbery. Jorje R. plead guilty to the charge.

In January 2015, defendant was arrested for vandalizing a bus stop sign, after he etched "4S" (a 4Dub symbol) and crossed out "2" (a WW' symbol) on the sign. As he was being patted down for weapons in connection with his January 2015 arrest, officers found a fully loaded, .38-caliber revolver, wrapped inside a rag in the groin area of defendant's pants.

11

B. *Defense Evidence*

Defendant testified in his own defense. He denied being a gang member and, like Jorje R., claimed that 4Dub was not a criminal street gang but a tagging crew comprised of young men who liked to hang out and smoke marijuana. Many times, WW and WMS members sought out 4Dub members to fight them, but 4Dub members did not want to fight and would run away. WW and WMS members usually had weapons and always outnumbered 4Dub members. 4Dub members never "went looking" for WW or WMS members. Defendant feared WW and WWS members. He had been in multiple fights with them, and many of them were older and larger than he and his 4Dub friends.

On the day of the shooting, defendant was with other 4Dub members at Mikey L.'s house. Corona drove by and yelled "Fuck 4Dub," a 4Dub member responded, then Corona said, "Oh, don't trip. I'll be back" and left. Around 20 minutes later, a red Acura drove near the house and its driver was "mad-dogging" the 4Dub members. There were at least three guys, including the driver, in the red Acura. The Acura made a U-turn, parked across the street from Mikey L.'s house, and at that point Mikey L., Michael F. and Moyses R. jumped over the fence and began to approach the Acura. Just then, defendant heard a whistle and saw 10 to 15 "guys" on Challen Street (Corona's group), walking toward Mikey L., Michael F., and Moyses R.

Mikey L. jumped back over the fence. But Michael F. and Moyses R. began to approach Corona's group. Corona's group and the 4Dub members were yelling back and forth at each other. Before trial, defendant told a police detective that Michael F. was carrying "a stick into the street." Defendant was scared when Corona's group appeared

12

because only a few 4Dub members were present, Corona's group outnumbered them, and he "knew something was going to happen." Members of Corona's group were also bigger than the 4Dub members, and three to five members of Corona's group were wearing masks and gloves.

Defendant also saw "a couple" members of Corona's group "pull something out" and he "knew it was a gun." He also saw guns "in the hands" of the three to five "guys" from Corona's group who were wearing masks and gloves. They were "holding [the guns] down" as they walked toward the 4Dub group. Defendant feared that he and his 4Dub friends would be killed.

When Corona's group showed up, a guy named "Robert," whom defendant had just met at Mikey L.'s house that day, was standing next to defendant in the front yard of Mikey L's house. Defendant saw that Robert had a gun. Robert ran away and as he did so he dropped the gun.[7]

Defendant picked up the gun, closed his eyes, and fired one shot into Corona's group, hoping to scare them away. He did not hear a second shot. Defendant denied he intended to shoot or kill anyone. He claimed he did not run away from the scene or go inside Mikey L.'s house because he feared he would be shot, and he did not shoot into the air because he "wasn't thinking all the way." He did not know he had hit Corona until he learned about it later on Facebook. After the shooting, he ran down the street and threw

---

[7] Jorje J. testified he did not know who "Robert" was, no one named Robert was at Mikey L.'s house on the day of the shooting, and defendant was the only person who was pointing a gun.

13

the gun in a trashcan, then he ran home, showered, and went to bed.  He was arrested four days after the shooting.

## II.  DISCUSSION

A. *The Trial Court Prejudicially Erred in Instructing the Jury on the Mutual Combat and Initial Aggressor Exceptions to the Right of Self-Defense (CALCRIM No. 3471)*

At defendant's request, the jury was instructed on the right of self-defense and defense of others, pursuant to CALCRIM No. 505.  Over defendant's objection, the court further instructed the jury on the initial aggressor and mutual combat exceptions to the right of self-defense and defense of others, pursuant to CALCRIM No. 3471.  Defendant claims it was prejudicial error to give CALCRIM No. 3471.  We agree.

As we explain, CALCRIM No. 3471 was erroneously given because insufficient evidence supported it.  No evidence showed that 4Dub members, including defendant, were initial aggressors in the confrontation with Corona's group, or that the two groups had a preexisting, mutual intention or agreement to engage in mutual combat.  The error was prejudicial because there is a reasonable probability that the jury would have believed defendant shot and killed Corona in self-defense or in defense of others, had CALCRIM No. 3471 not been given.  Thus, we reverse defendant's voluntary manslaughter conviction and the personal use enhancement on that conviction.

    1.  <u>Relevant Background</u>

        (a)  *CALCRIM No. 505*

As given, CALCRIM No. 505 instructed the jury:  "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense or defense

14

of another. The defendant acted in lawful self-defense or defense of another if: [¶]

1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else. [The] [d]efendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The defendant's belief that he or someone else was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

"If you find that the defendant knew that Jose Corona had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's

15

conduct and beliefs were reasonable. [¶] Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder of manslaughter."

(b) *CALCRIM No. 3471*

As given, CALCRIM No. 3471 told the jury: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. However, if the defendant used only non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with

16

deadly force and was not required to try to stop fighting or communicate the desire to stop the opponent, or give the opponent a chance to stop fighting.  [¶]  *A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."*  (Added italics.)

(c)  *The Trial Court's Reasons for Giving CALCRIM No. 3471*

Following the close of the evidence and while discussing jury instructions with counsel, the court noted that neither side had asked it to give CALCRIM No. 3471, but the court said it believed the instruction should be given with the self-defense instruction defendant was requesting.  The court reasoned that CALCRIM No. 3471 was "within the scope of the evidence," because some evidence showed and the jury could reasonably determine that the mutual combat exception to the right of self-defense and defense of others applied.  The court reasoned there was some evidence that "both sides gathered numbers for what they knew was going to be a confrontation,"  and that "one possible" "iteration" of the evidence was that the two opposing sides or groups did not like each other and were "preparing for battle."  In the court's view, this was "the substance of mutual combat."

Defense counsel objected to giving CALCRIM No. 3471 because insufficient evidence supported it.  He argued the 4Dub members did not "gather numbers" for a fight, rather, "[t]hey were just there" at Mickey L.'s house, "doing nothing but drinking beer, not looking for problems," and it was "very clear" that Corona "started the fight." Thus, he argued, CALCRIM No. 3471 would erroneously instruct the jury that defendant

had a duty to make a good faith effort to "try to stop the fight," before he could claim he justifiably shot Corona in self-defense or defense of others. No one argued there was any evidence that defendant tried to stop the fight.

The court then pointed out that CALCRIM No. 3471 defined mutual combat, and that the jury would conclude that the mutual combat exception to the right of self-defense and defense of others applied "only if" the jury concluded there was mutual combat. The court also reasoned that the jury could find mutual combat based on the evidence that "after a car [the red Acura] drove by," "two people [from the 4Dub group] jump the fence and head for that car, and there was "at least one iteration that somebody may have had a bat or a stick in their hand." Then, after Corona's group showed up, the two 4Dub members headed "directly for [Corona's] group." The court said, "That sounds a lot like mutual combat to me. That sounds a lot like two groups who know what's going down and are more than happy to oblige each other."

Defense counsel further objected to CALCRIM No. 3471 on the ground it was inconsistent with his defense of self-defense. On this point, the court noted that it had a duty to give CALCRIM No. 3471 *sua sponte* if substantial evidence supported it, but then said it would not give the instruction if both parties objected to it. Defense counsel maintained his objection, but the prosecutor agreed that the evidence supported the instruction and asked the court to give it.

2. Insufficient Evidence Supported Giving CALCRIM No. 3471

Defendant argues that CALCRIM No. 3471 was erroneously given because no evidence showed that he or his 4Dub friends were the initial aggressors in any

18

confrontation or fight with WMS/WW, or that the two opposing groups engaged in mutual combat before he shot and killed Corona. We agree.

" ' "It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence" ' and ' "necessary for the jury's understanding of the case." ' [Citations.]" *People v. Brooks* (2017) 3 Cal.5th 1, 73.) But "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).)

The prosecution asked the court to give CALCRIM No. 3471, after the court advised the parties that it thought the instruction should be given with CALCRIM No. 505, but would not give the instruction if both parties objected to it. "A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.]" (*People v. Ro*ss (2007) 155 Cal.App.4th 1033, 1049 (*Ross*).) Substantial evidence is evidence "sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) But CALCRIM No. 3471 was given in error, regardless whether it was given on the court's own motion or because the prosecution requested it. In either case, insufficient evidence showed that the initial aggressor exception or the mutual combat exceptions to the right of self-defense or defense of another applied.

CALCRIM. 3471 reflects the long-standing common law principle, codified in section 197, that the right to kill in self-defense or in defense of another is not available if the defendant "was the assailant or engaged in mutual combat," unless the defendant

19

"really and in good faith . . . endeavored to decline any further struggle before the homicide was committed." (§ 197, subd. (3); *People v. Button* (1895) 106 Cal. 628, 631 [Section 197 "is simply declarative of the common law . . . since the days of Lord Hale"].) When applicable, the initial aggressor and mutual combat doctrines condition a defendant's right to use force in self-defense or in defense of another on the defendant's good faith effort to try to stop the fight—the fight that the defendant either started or mutually agreed, with the opponent, to engage in.

(a) *The Initial Aggressor Exception Did Not Apply*

We begin with the initial aggressor exception. In the words of CALCRIM No. 3471, one who "starts a fight" is the initial aggressor in the fight. Here, no evidence showed that any of the 4Dub members at Mikey L.'s house, including defendant, were the initial aggressors in any part of the April 30, 2015 confrontation with Corona, with the subsequent confrontation with the red Acura's occupants, or with Corona's group. Instead, all of the evidence showed that Corona initiated a confrontation with the 4Dub members when he stopped his car in front of Mikey L.'s house, and Corona and the 4Dub members exchanged profanities before Corona drove away, saying he would be back.

The verbal confrontation with Corona escalated when the red Acura showed up, its driver "maddogged" the 4Dub members, and it parked across the street from Mikey L.'s house on Challen Street. Just as Mikey L. stepped into the street, unarmed, on his way to confront the red Acura's two or three occupants, Corona, Anthony H., Mark T., and the rest of Corona's group showed up and gathered on the sidewalk on Remington Street, across the street in front of Mikey L.'s house. At that point, the exchange of profanities

20

resumed between the two opposing groups, and Mark T. directly challenged 4Dub to a fight by stepping into the street and saying, "Who's first?"

All of the evidence showed that Corona initiated a verbal confrontation with 4Dub and that Corona and his group, along with the red Acura's occupants, then perpetuated and escalated the confrontation. Corona was a WMS member and Anthony H. and Mark T. were WW members. Although no witness recognized the red Acura's occupants, it reasonably appeared that they were there to support Corona's group in the ongoing confrontation with 4Dub. Additionally, WMS/WW members had a history of initiating physical fights with 4Dub members and assaulting them with cars. That history, coupled with Corona's actions, the gloves and masks worn by some of the members of Corona's group, and Mark T.'s "Who's First?" challenge, unequivocally showed that Corona and his cohorts were the initially aggressors in the entire confrontation with 4Dub.

To be sure, the evidence showed that 4Dub and WMS/WW members often fought each other at parties, and that 4Dub members were "sometimes" "more than willing" to fight with WMS and WW. But in this instance, no evidence showed that any 4Dub members, including defendant, were the initial aggressors in any part of the April 30, 2015 confrontation with Corona and other WW/WMS members. To the contrary, all of the evidence showed that Corona initiated the verbal confrontation with 4Dub, and that he and his cohorts later escalated the verbal confrontation to a physical confrontation. As defense counsel argued, the 4Dub members "were just there" at Mikey L.'s house, minding their own business in the front yard, when Corona and his cohorts confronted them and challenged them to a fight.

21

The People argue substantial evidence showed that defendant and 4Dub were the initial aggressors. They point to the evidence that, when the red Acura showed up, three 4Dub members, Mikey L., Michael F., Moyses R., jumped over the fence and began to approach the red Acura to confront its occupants. Before they got to the red Acura, Corona's group showed up, Mikey L. jumped back over the fence, and Michael F., who was carrying a stick in his hand, and Moyses R., "started to . . . approach" Corona's group. At most, the actions of Mikey L., Moyses R., and Michael F., together with the history of conflict between 4Dub and WMS/WW, showed that the 4Dub members, including defendant, were ready and willing to fight with Corona and his cohorts. But being ready and willing to fight is not "starting a fight" or being the initial aggressor in a fight.

(b) *The Mutual Combat Exception Did Not Apply*

Insufficient evidence also supported the mutual combat exception. Although, as the trial court reasoned, substantial evidence showed that the two opposing groups were "preparing for battle" and wanted to fight with each other, no evidence showed that the two groups had *a prearranged agreement or preexisting mutual intention* to fight, before Corona initiated the confrontation with 4Dub. Thus, defendant did not have a duty to make a good faith effort to call off the fight or lose his right to claim that he justifiably shot and killed Corona in self-defense or defense of others.

" '[A]s used in this state's law of self-defense, "mutual combat" means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*. In other words, it is not merely the

22

combat, but the preexisting intention to engage in it, that must be mutual. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 (*Nguyen*), quoting *Ross*, *supra*, 155 Cal.App.4th at p. 1045.)

As the *Ross* court explained, the " 'combat' element of [the mutual combat] rule is clear enough . . . . It suggests two (or more) persons fighting, whether by fencing with swords, having a go at fisticuffs, slashing at one another with switchblades, or facing off with six-guns on the dusty streets of fabled Dodge City. The trouble arises from 'mutual.' " (*Ross*, *supra*, 155 Cal.App.4th at pp. 1043-1044.) "The mutuality triggering the doctrine [of mutual combat] inheres not in the combat but in the preexisting intent to engage in it. Old but intact caselaw confirms that . . . 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*Id.* at p. 1045.)

" 'It has long been established that one who voluntarily engages in mutual combat with another must have endeavored to withdraw therefrom before he can be justified in killing his adversary to save his own life [or the life of another]. Both before and since [the 1872 enactment of Penal Code section 197] the phrase "mutual combat" has been in general use to designate the branch of the law of self-defense relating to homicides committed in the course of *a duel or other fight begun or continued by mutual consent or agreement, express or implied.* [Citations.] In other words, it is not merely the *combat*, but the *preexisting intention to engage in it*, that must be mutual.' " (*Ross*, *supra*, 155 Cal.App.4th at p. 1045, fn. omitted; quoting *People v. Fowler* (1918) 178 Cal. 657, 671.

23

Thus, two individuals or groups may spontaneously "prepare for battle" and form a mutual intention to fight with each other, but the mutual combat doctrine does not apply unless the two groups *shared a preexisting, mutual intention or agreement* to engage in combat *before* the combat began. (See § 197, subd. (3).) Here, there was no evidence of mutual combat, because no evidence showed that 4Dub and WMS/WW members had a preexisting mutual agreement or intention, express or implied, to fight each other on April 30, 2015, *before* Corona initiated then escalated the confrontation.

The facts of *Nguyen* are instructive. There, substantial evidence supported instructing the jury on the mutual combat doctrine because the record showed that two opposing criminal street gangs were engaged in "an ongoing gang war" when two of their respective members, including the defendant, engaged each other in a gun battle and the defendant shot and killed his gang rival. (*Nguyen*, *supra*, 61 Cal.4th at pp. 1030-1031, 1043-1044.) The *Nguyen* court reasoned: "In light of . . . testimony regarding the state of war that existed between the [two gangs] during the period in question, the jury could reasonably have concluded that these rival gangs had a preexisting intention to engage in hostilities whenever the opportunity presented itself." (*Ibid.*)

But here, insufficient evidence showed that 4Dub and WMS/WW members were engaged in any *ongoing gang war* or had mutually agreed to engage in combat whenever the opportunity arose, including on April 30, 2015. Although the two groups "often" fought each other at parties, and 4Dub was "sometimes" "more than willing to fight" with WMS/WW, no evidence showed that the two groups shared a preexisting agreement or intention to engage in combat on April 30, 2015. To be sure, 4Dub did not run when it

24

was challenged on April 30, 2015; its members stood their ground and, through the actions of three of its members, Mikey L., Moyses, R., and Michael F., 4Dub showed that it was prepared and willing to fight with WMS/WW. But no reasonable juror could have found beyond a reasonable doubt that the two groups shared a preexisting, mutual agreement or intention to fight whenever the opportunity arose, or before Corona initiated, and subsequently escalated, the April 30, 2015 confrontation.

Indeed, unless a mutual agreement or intention to fight is formed *before* hostilities are initiated, it makes no sense to require a defendant to make a good faith effort to stop the fight before the defendant may claim he or she justifiably killed an opponent in self-defense or defense of another. (§ 197, subd. (3).) When a fight suddenly arises or continues, without a preexisting mutual agreement or intention to fight, the defendant who would claim he or she killed in self-defense or defense of others may be killed or "beaten . . . senseless" before the defendant has a chance to ask his or her opponent to stop the fight. (*Ross*, *supra*, 155 Cal.App.4th at p. 1044.)[8]

The evidence that the 4Dub and WMS/WW members were "gathering numbers" and "preparing for battle" did not indicate that the two groups shared a preexisting mutual agreement or intention to engage in combat, at any time before defendant shot and killed Corona. Mutual combat is not shown by evidence that two opposing parties or groups " 'want to fight.' Missing is the critical requirement that this common intention or desire

---

[8] CALCRIM No. 3471 correctly defined mutual combat for the jury: "A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

25

[to fight] must precede the first assaultive conduct, or at least the first conduct sufficient to trigger a right of self-defense in its target." (*Ross*, *supra*, 15 Cal.App.4th at p. 1045, fn. 14.)  The evidence that Mikey L., Michael F., and Moyses R. were on their way to confront the occupants of the red Acura when Corona's group showed up, and that Michael F., who was carrying a stick, and Moyses R. began to approach Corona's group as soon as it arrived, indicated that the 4Dub group was "preparing for battle" and wanted to fight.  But the evidence did not allow a reasonable juror to conclude beyond a reasonable doubt that the two groups shared a preexisting mutual agreement or intention to engage in combat, at any time before defendant shot and killed Corona.

     3.  <u>The Instructional Error Was Prejudicial</u>

As we have noted, "it is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*Guiton*, *supra*, 4 Cal.4th at p. 1129.)  This error is not of federal constitutional law; it is of state law, and the applicable standard of review is the *Watson*[9] standard.  (*Guiton*, at pp. 1129-1130.)

Under the *Watson* standard, reversal is required "only if, 'after an examination of the entire cause, including the evidence,' (Cal. Const., art. VI, § 13) it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (*Watson*, *supra*, 46 Cal.2d 818, 836)." (*People v. Breverman* (1998) 19 Cal.4th 142, 178, fn. omitted.)  For these purposes, a reasonable probability

---

     [9] *People v. Watson* (1956)  46 Cal.2d 818, 836 (*Watson*).

does not mean more likely than not; it means "a reasonable chance, more than an abstract possibility." (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

Because CALCRIM No. 3471 was given, there is a reasonable chance that defendant would have realized a more favorable outcome had CALCRIM No. 3471 not been given. Specifically, the jury may have concluded that Corona's homicide was justified in self-defense or in defense of others, and would have acquitted defendant of voluntary manslaughter and the personal use enhancement had CALCRIM No. 3471 not been given.

Defendant testified that some members of Corona's group were carrying guns, and according to defendant and Jorje R., some members of Corona's group were wearing masks and gloves. Mark T., who was with Corona's group, directly challenged the 4Dub members to a fight by stepping into the street and asking "Who's First?" This evidence showed that Corona's group was threatening to inflict great bodily injury on, or possibly kill, one or more of the 4Dub members. But, because CALCRIM No. 3471 was given, there is a reasonable chance that the jury did not consider defendant's testimony that some of the 4Dub members were carrying guns, or defendant's and Jorje R.'s testimony that some of the members of Corona's group were masked and gloved, and were ostensibly threating to inflict great bodily injury or death on one or more 4Dub members.

"CALCRIM No. 3471 charges a jury to make a *preliminary determination* of whether the defendant had the *right* to use force to defend himself when the defendant and the victim engaged in mutual combat, or when the defendant was the initial aggressor." (*People v. Johnson* (2009) 180 Cal.App.4th 702, 711.) CALCRIM No. 3471

27

instructed the jury: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting." CALCRIM No. 3471 specifically defined mutual combat: *"A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose*." (Added italics.)

As we have explained, it was error to given CALCRIM No. 3471 because insufficient evidence support it. The evidence that three of the 4Dub members began to approach Corona's group, and that the entire 4Dub group was thus "preparing for battle" and was willing to fight, was insufficient to allow a reasonable juror to conclude beyond a reasonable doubt that the 4Dub and WMS/WW groups shared a mutual agreement to engage in combat before defendant shot and killed Corona. But the jury may well have concluded that CALCRIM No. 3471's definition of mutual combat was met, based on the evidence that the 4Dub group was "preparing for battle" and was therefore willing to fight with WMS/WW, before defendant shot and killed Corona.

Although CALCRIM No. 3471 correctly defined mutual combat as an abstract principle, there is a reasonable probability that the jury misapplied the definition and erroneously concluded that the opposing 4Dub and WMS/WW groups were engaged in mutual combat, and that defendant therefore had a duty to try to end the combat, before he shot and killed Corona, in order to claim the homicide was justified in self-defense or

28

defense of others. Because no evidence showed that defendant tried to end the confrontation, or gave Corona's group a chance to end it, there is a reasonable probability that the jury rejected defendant's claim of self-defense or defense of others based on the erroneous conclusion that defendant was not entitled to claim self-defense or defense of others.

The People argue that any error in giving CALCRIM No. 3471 was necessarily harmless because juries are presumed to ignore irrelevant instructions, and the jury here was specifically instructed to disregard any instructions it found irrelevant. (CALCRIM No. 200.) The People rely on the principle that, "The jury was as well equipped as any court to analyze the evidence and to reach a rational conclusion. The jurors' 'own intelligence and expertise will save them from' the error of giving them 'the option of relying upon a factually inadequate theory.' " (*Guiton*, *supra*, 4 Cal.4th at p. 1131.) But, for the reasons explained, there is a reasonable probability that the jury relied on the factually inadequate theory of mutual combat in rejecting defendant's claim that he killed Corona in self-defense or defense of others.

B. *The Matter Must be Remanded to the Juvenile Court for Further Proceedings and Disposition (Senate Bill 1391)*

Defendant was 15 years old when he committed the charged offenses. He was originally charged in criminal court and treated as an adult. (Welf. & Inst. Code, fmr. § 707, subd. (d)(1)-(2).) Then, in November 2016, the voters enacted Proposition 57, which amended section 707 of the Welfare and Institutions Code to require that any criminal conduct, alleged against any person under the age of 18 years, be commenced in

29

juvenile court. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 304-306.) In December 2016, the matter was transferred to the juvenile court, but in September 2017, the matter was transferred back to the criminal court. In May 2018, the jury convicted defendant of voluntary manslaughter in Corona's killing, with a personal use enhancement, and unlawfully possessing a firearm. In September 2018, defendant was sentenced to 16 years in state prison.

In September 2018, while this appeal was pending, the Governor signed Senate Bill 1391 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1012, § 1) (SB 1391), which amended Proposition 57, effectively January 1, 2019, to repeal the prosecutor's authority to transfer a minor from the juvenile court to the criminal court when the minor was 14 or 15 years old at the time of the offense, save a narrow exception that applies when the minor is "not apprehended prior to the end of juvenile court jurisdiction."[10] (Welf. & Inst. Code, § 707, subd. (a)(2); *People v. Superior Court (Alexander C.)* (2019) 34 Cal.App.5th 994, 998.) Defendant and the People agree, and so do we, that SB 1391 applies retroactively to defendant, and that the matter must be remanded to the juvenile court for further proceedings and disposition.

Under the rationale of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*)), courts are to presume, absent evidence to the contrary, that the Legislature intended statutory amendments that reduce criminal punishment to apply to all defendants whose judgments of conviction and sentence were not final on appeal on the effective date of the amended

---

[10] This exception does not apply to defendant because he was apprehended before juvenile court jurisdiction expired.

30

statute.  (*People v. Brown* (2012) 54 Cal.4th 314, 323.)  The *Estrada* rationale has been held to apply to defendants who, like defendant here, were under the age of 18 when they were charged in adult court prior to the November 9, 2016 effective date of Proposition 57.  (*People v. Superior Court (Lara)*, *supra*, 4 Cal.5th at p. 303 [Proposition 57 applies retroactively because "[t]he possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment"].)  By the same logic, SB 1391 applies retroactively to defendant's nonfinal judgment of conviction and sentence.

Because defendant was under age 16 when he committed the charged offenses, SB 1391 prohibits him from being tried in adult court and vests jurisdiction exclusively in the juvenile court.  Thus, we vacate defendant's state prison sentence and remand the matter to the juvenile court for further proceedings.  If the People so elect, these proceedings will include the adjudication of the murder charge in count 1 and the personal use allegation in count 1.  On remand, the juvenile court must treat defendant's convictions, including his conviction in count 2, as juvenile court adjudications, and must enter appropriate juvenile court findings and an appropriate juvenile court disposition following a dispositional hearing.  (Welf. & Inst. Code, §§ 602, 702, 706.)

C.  *Defendant's Three Claims of Sentencing Error Have Merit*

Defendant's claims and the People and we agree that the court's sentencing order contains three errors.  We amend the judgment to correct these errors and remand the matter to the juvenile court for further proceedings consistent with this opinion.

1. The Order to Pay Costs of Presentence Incarceration (§ 1203.1c)

Defendant was ordered to pay $1,500 for the costs of his 1,237 days of presentence incarceration. (§ 1203.1c.) The parties and we agree that, because defendant was sentenced to state prison rather than to any period of confinement in a local detention facility, section 1203.1c does not apply.12[11] Thus, the order requiring defendant to pay $1,500 for the costs of his presentence incarceration is unauthorized and must be stricken from the judgment. (*People v. Scott* (1994) 9 Cal.4th 331, 354 [a sentence is unauthorized where it could not lawfully be imposed under any circumstances in the particular case]; *People v. Smith* (2001) 24 Cal.4th 849, 854 [appellate court may correct unauthorized sentencing errors at any time, regardless of whether an objection to the error was raised in the trial court].)

2. The Unauthorized Portions of the Section 29810 Order

In pronouncing sentence, the court told defendant: "You are not to knowingly own, possess, or have in your control any firearm, ammunition, or loaded ammunition for life." (§ 29810.) More broadly, and in contrast to the court's oral pronouncement of judgment, the sentencing minute order prohibits defendant from owning, possessing, or controlling any "*deadly weapon*" or "*related paraphernalia*." As the parties and we agree, this part of the sentencing minute order was unauthorized and must be stricken

---

[11] Section 1203.1c, subdivision (a) provides: "In any case in which a defendant is convicted of an offense and is ordered to serve a period of confinement in a county jail, city jail, or other local detention facility as a term of probation or a conditional sentence, the court may, after a hearing, make a determination of the ability of the defendant to pay all of a portion of the reasonable costs of such incarceration, including incarceration pending disposition of the case."

32

from the judgment. Section 29800 prohibits any person convicted of a felony from owning, purchasing, receiving, or possessing a firearm. (§ 29800, subd. (a).) When a defendant is currently convicted of a felony and is therefore subject to section 29800, section 29810 requires the trial court to notify the defendant of the restrictions regarding the defendant's ownership and possession of firearms, at the time of sentencing. Specifically, the court is to advise the defendant that he or she is prohibited from owning, possessing, or controlling "firearms, ammunition, and ammunition feeding devices, including but not limited to magazines." (§ 29810, subd. (a)(2).)

But nothing in section 29800 prohibits the defendant from owning, possessing, or controlling any "deadly weapon" or "related paraphernalia," and nothing in section 29810 requires the court to give that admonition. Thus, the part of the sentencing minute order prohibiting defendant from owning, possessing, or controlling any "deadly weapon" or "related paraphernalia" is both unauthorized and inconsistent with the trial court's oral pronouncement of judgment. It must therefore be stricken from the judgment. (*People v. Scott*, *supra*, 9 Cal.4th at p. 354; *People v. Smith*, *supra*, 24 Cal.4th at p. 854; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

    3. Defendant's Ability to Pay Fines and Fees Must Be Considered on Remand

    Based on *People v. Dueñas*, *supra*, 30 Cal.App.5th 1157, which was decided in January 2019, after defendant was sentenced in September 2018, defendant claims the trial court violated his due process and equal protection rights by imposing several fees and fines and fees at sentencing, without first determining he was able to pay them. The challenged fees and fines total $954.53 and include an $80 court operations assessment

33

fee (Pen. Code, § 1465.8), a $60 court facilities fee (Gov. Code, § 70373), a $514.53 booking fee (Gov. Code, § 29550), and a $300 restitution fine. (Pen. Code, § 1202.4, subd. (b).)

Defendant argues that the matter must re remanded to the trial court to conduct an ability to pay hearing on the challenged fines and fees. The People agree that, because the matter must be remanded to the juvenile court, the matter should also be remanded so that defendant may request a hearing and present evidence demonstrating his inability to pay the fines, fees and assessments imposed at sentencing. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.) We agree with the People. Because the juvenile court must treat defendant as a juvenile offender, the juvenile court must consider anew whether to impose the challenged fines and fees, based on defendant's ability to pay them and any other appropriate considerations.

## III. DISPOSITION

Defendant's voluntary manslaughter conviction in count 1 (§ 190, subd. (a)) and the personal use enhancement in count 1 (§ 12022.5, subd. (a)) are reversed. Defendant's 16-year state prison sentence, including the two-year stayed term on his conviction in count 2 for unlawfully possessing a firearm (§ 29820), is vacated, but defendant's conviction in count 2 is affirmed. The order requiring defendant to pay $1,500 for the costs of his presentence incarceration (§ 1203.1c), and the order prohibiting defendant from owning or possessing, or controlling any "deadly weapon" or "related paraphernalia" are to be stricken from defendant's sentence.

34

The matter is remanded to the juvenile court for further proceedings consistent with this opinion. If the People so elect, these further proceedings will include the juvenile court adjudication of the murder charge and personal use allegation. On remand, the court must treat all of defendant's convictions as juvenile court adjudications, rather than as criminal convictions or enhancements. The court must enter appropriate juvenile court findings (Welf & Inst. Code, § 702) and impose an appropriate juvenile court disposition following a dispositional hearing. (Welf. & Inst. Code, § 706.) The court must also allow defendant an opportunity to present evidence that he is unable to pay all or part of the $954.53 in fines and fees imposed at sentencing and which he has challenged in this appeal. *(People v. Dueñas*, *supra*, 30 Cal.App.5th 1157; *People v. Castellano*, *supra*, 33 Cal.App.5th at p. 490.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
                                J.


We concur:


CODRINGTON _____
                Acting P. J.


RAPHAEL _____
                        J.